Q:08-cv-5745 LEW KJM

AO 241 (Rev. 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

# United States District Court

District EASTERN

| Name | Prisoner No. | Case No. |
|------|--------------|----------|
| CEARIACO CABRELLIS | V-63705 | |

Place of Confinement

OLD FOLSOM STATE PRISON,P.O.BOX 950,FOLSOM,CA 95763

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| IN Re CEARIACO CABRELLIS    V. M.C.KRAMER,WARDEN | |

The Attorney General of the State of: CALIFORNIA

## PETITION

1. Name and location of court which entered the judgment of conviction under attack  ALAMEDA CO.SUPERIOR

   COURT

2. Date of judgment of conviction    DECEMBER 19,2003/FEBRUARY 11,2004

3. Length of sentence   14YRS./4MTHS.

4. Nature of offense involved (all counts) ONE CT.OF 2ND DEGREE BURGLARY;TWO CTS.OF 2ND

   DEGREE ROBBERY;TWO CTS. OF FALSE IMPRISONMENT;TWO CTS. OF

   ATTEMPTING TO DISSUADE A WITNESS;ONE CT. OF CUTTING A UTILITY LINE

   THE JURY ALSO FOUND SEVERAL ENHANCEMENTS TRUE..

5. What was your plea? (Check one)
   (a) Not guilty         ☒
   (b) Guilty             ☐
   (c) Nolo contendere    ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:



6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury        ☒
   (b) Judge only  ☐

7. Did you testify at the trial?
   Yes ☐  No ☒

8. Did you appeal from the judgment of conviction?
   Yes ☒  No ☐

# FILED

MAR 1 3 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
                    DEPUTY CLERK

(2)

9. If you did appeal, answer the following:

(a) Name of court  FIRST APPELLATE DISTRICT,CA COURT OF APPEAL

(b) Result  GRANTED IN PART

(c) Date of result and citation, if known  7-11-06,EXHIBIT#1;A105385

(d) Grounds raised  INSTRUCTIONAL ERRORS;P.C.654 VIOLATIONS,BLAKELY VIOLATIONS

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court  CA SUPREME COURT

(2) Result  DENIED

(3) Date of result and citation, if known  10-18-06,EXHIBIT#2,S145838

(4) Grounds raised  SAME AS MENTIONED ABOVE

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

(1) Name of court  U.S.SUPREME COURT

(2) Result  JUDGMENT VACATED AND REMANDED

(3) Date of result and citation, if known  3-19-07,

(4) Grounds raised  BLAKELY ERROR

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☒  No ☐

11. If your answer to 10 was "yes," give the following information:
(a) (1) Name of court  ON REMAND-FIRST APPELLATE DISTRICT,CA COURT OF APPEAL

(2) Nature of proceeding  REMAND BY US SUPREME COURT/DIRECT APPEAL

(3) Grounds raised  BLAKELY/CUNNINGHAM ERROR

_____

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
   Yes ☐  No ☒

(5) Result  DENIED, EXHIBIT#3

(6) Date of result  9-19-07

(b) As to any second petition, application or motion give the same information:

   (1) Name of court  CA SUPREME COURT

   (2) Nature of proceeding  REMAND BY US SUPREME COURT

   _____

   (3) Grounds raised  BLAKELY/CUNNINGHAM ERROR

   _____

   _____

   _____

   _____

   (4) Did you receive an evidentiary hearing on your petition, application or motion?
      Yes ☐  No ☒
   (5) Result  DENIED, EXHIBIT#4

   (6) Date of result  11-28-07

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

   (1) First petition, etc.    Yes ☒  No ☐  SEE ITEM#10(b)
   (2) Second petition,        Yes ☐  No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

   N/A

   _____

   _____

   _____

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.
   CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
(b) Conviction obtained by use of coerced confession.
(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e) Conviction obtained by a violation of the privilege against self-incrimination.
(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g) Conviction obtained by a violation of the protection against double jeopardy.
(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
(I) Denial of effective assistance of counsel.
(j) Denial of right of appeal.

A. Ground one:    SEE ATTACHED SHEETS
_____

_____

Supporting FACTS (state *briefly* without citing cases or law)    SEE ATTACHED SHEET
_____

_____

_____

_____

_____

_____

_____

B. Ground two:  SEE ATTACHED SHEET
_____

_____

Supporting FACTS (state *briefly* without citing cases or law):  SEE ATTTACHED SHEET
_____

_____

_____

_____

_____

_____

_____

C. Ground three: SEE ATTACHED SHEETS

Supporting FACTS (state *briefly* without citing cases or law): SEE ATTACHED SHEETS

D. Ground four: SEE ATTACHED SHEETS

Supporting FACTS (state *briefly* without citing cases or law): SEE ATTACHED SHEETS

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them: N/A

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐ No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing N/A

(b) At arraignment and plea N/A

AO 241 (Rev. 5/85)

(c) At trial  N/A

(d) At sentencing  N/A

(e) On appeal  DIRCK P. NEWBURY

(f) In any post-conviction proceeding  N/A

(g) On appeal from any adverse ruling in a post-conviction proceeding  N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes X  No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐  No X
(a) If so, give name and location of court which imposed sentence to be served in the future: _____

(b) Give date and length of the above sentence: _____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐  No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed

3-11-08
(date)

_____
Signature of Petitioner

1  interpretation or application of state law.(Estelle v McGuire

2  (1991) 502 US 62, 116 L.Ed.2d 385).  However, if state law,

3  whether statutory or decisional, create a liberty interest

4  protected by the federal due process clause, or if the error in

5  interpretation or application of state law is so egregious as to

6  offend federal due process standards(Carter v Kentucky(1981) 450

7  US 288,67 L.Ed.2d 241) relief will be granted in federal court.

8  Under AEDPA, the federal court may grant federal habeas relief

9  only if the decision: 1.was contrary to or involved an

10  unreasonable application of clearly established federal law, as

11  determined by the Supreme Court of the United States, or 2.was

12  based on an unreasonable determination of the facts in light of the

13  evidence presented in the state court proceeding.(28 U.S.C. §

14  2254 (d)(1)(2);Williams v Taylor(2000) 529 US 362,146 L.Ed.2d.389)

15  A decision is contrary to clearly established Supreme Court law if

16  it either applies a rule that contradicts the governing law set

17  forth in US Supreme Court cases or arrives at a different result

18  on facts that are materially indistinguishable from the facts in

19  a US Supreme Court case.(529 US at 406)  An unreasonable

20  application of clearly established US Supreme Court precedent is

21  one that identifies the correct governing legal rule from this

22  Court's cases but unreasonably applies it to the facts of the

23  particular state prisoner's case or either unreasonably extends

24  a legal principle from our precedent to a new context where it

25  should not apply or unreasonably refuse to extend that principle

26  to a new context where it should apply.(529 US at 407)

27

28

1  LEGAL ARGUMENT

2  I. DID THE TRIAL COURT VIOLATE THE CUNNINGHAM RULE WHEN IT
       DEPRIVED APPELLANT OF A JURY TRIAL TO DETERMINE WHETHER
3      AGGRAVATING FACTORS EXISTED WARRANTING THE IMPOSITION OF THE
       UPPER TERM
4

5  On January 22,2007, the U.S. Supreme Court decided Cunningham v

6  California(2007) 127 S.Ct.856.  The high court reaffirmed

7  Apprendi v New Jersey(2000) 530 US 466 and Blakely v Washington

8  (2004) 542 US 296), and held California's determinate sentencing

9  law(DSL) violates a defendant's constitutional right to a jury

10 trial  to the extent it authorizes the trial judge to find facts

11 (other than a prior conviction) that expose a defendant to an

12 upper term sentence by a preponderance of evidence.

13 "This Court has repeatedly held that, under the Sixth Amendment,

14 any fact that exposes a defendant to a greater potential sentence

15 MUST be found by a jury, not a judge, and established beyond a

16 reasonable doubt, not merely by a preponderance of the evidence"

17 (Cunningham,127 S.Ct.,p.863-64)

18 In the case at bar, it is undisputed that the trial court,  and

19 not a jury, found appellant's aggravating factors true by a

20 preponderance of evidence rather than beyond a reasonable doubt.

21 It is also undisputed that the "Cunningham rule" is retroactive

22 in appellant's case.  Hence, appellant's sentence should be

23 reversed.

24 II. CUNNINGHAM CLAIM NOT BARRED OR HARMLESS ERROR BECAUSE
       TRIAL COURT ERRONEOUSLY VIEWS RELIANCE ON CERTAIN AGGRAVATING
25     FACTORS,BY THE COURT AND NOT A JURY, IS NOT VOLATIVE OF
       SIXTH AND FOURTEENTH AMENDMENTS
26

27 In People v Black, 41 Cal.4th 799),hereinafter BlackII, a remand

28 to the California Supreme Court after the United States Supreme

**4**

1  had reversed BlackI, the CA Supreme Court ruled that there was no
2  Cunningham error because two of the aggravating factors found by
3  the trial court did not offend the Sixth Amendment concerns raised
4  in Cunningham.   Therefore, it reasoned that the other aggravating
5  factors the trial court in the Black case found in violation of
6  the Sixth Amendment were moot.   The root of this reasoning flows
7  from the fact that under California law a single aggravating
8  factor can justify the imposition of an upper term sentence.
9  In the case at bar, the trial court, not a jury, found true by a
10  preponderance of evidence rather than beyond a reasonable doubt
11  aggravating factors that related to appellant and the commission
12  of the offense, pursuant to CA Rules of Crt. 4.421(a)(b) (RT 3699-
13  3700)
14  In the present case and upon remand by the U.S. Supreme Court, the
15  First Appellate District relied on only three of the aggravating
16  factors found by the trial court that it found congruant with the
17  BlackII holding in affirming appellant's sentence.(Exhibit#3,p.3,
18  2nd paragraph;See Also Exhibit#5)
19  The state appellate court cited the following aggravating factors
20  not requiring a jury trial but still justifying the imposition
21  of the upper term: 1.defendant's prior convictions as an adult are
22  numerous; 2.defendant has served prior prison terms or prior
23  prison term; and 3.defendant's prior performance on probation and
24  parole was unsatisfactory.
25  Appellant will address each in turn, revealing the BlackII holding
26  and the First Appellate District"s reliance on it, to run
27  constitutionally counter to Cunningham's legal rationale.
28

1  A. DEFENDANT'S PRIOR CONVICTIONS AS AN ADULT ARE NUMEROUS

2  The state appellate court's contention that this aggravating

3  factor falls outside the "Cunningham" rule is flawed in that a

4  determination as to whether the quantity of appellant's "prior

5  convictions as an adult are numerous" is a relative approach,

6  discernible only by a jury.  This means that what one person deems

7  to be numerous another person may not. For example, to one person

8  90 degree weather may be considered hot, while to another person

9  the 90 degree weather condition to be mild and comfortable.

10  Just as one person may view $100.00 to be alot of money, while

11  another person may deem it to be an insignficant amount.

12  Cunningham requires that a jury, not a trial judge, to make the

13  determination beyond a reasonable doubt as to whether appellant's

14  prior conviction as an adult are numerous.

15  B. DEFENDANT HAS SERVED PRIOR PRION TERMS OR A PRIOR PRISON TERM

16  This aggravating factor commands the same constitutional jury trial

17  requirement as is required when a bifurcated trial is held to

18  prove a prior conviction was suffered in order to enhance a persons

19  sentence under the CA Three Strikes Law.

20  Thus, to prove appellant suffered prior prison terms or a prior

21  prison term, the "Cunningham" rule requires that the State should

22  produce evidence to a jury that proves beyond a reasonable doubt

23  that appellant indeed suffered the prior prison terms or a prior

24  prison term in question.

25  C. DEFENDANT'S PRIOR PERFORMANCE ON PROBATION AND PAROLE
       UNSATISFACTORY

26

27  The argument laid out in section "B" above is applicable here and

28  shows the Cunningham holding requires the state to present

6

1  evidence to a jury that proves true beyond a reasonable doubt

2  that appellant's prior performance on probation and/or parole

3  was unsatisfactory, which first necessitates proving beyond a

4  reasonable doubt to  jury that appellant suffered the prior

5  convictions leading to the placement on probation and/or parole.

6  The BlackII and the First Appellate District holding that the

7  "Cunningham" rule does not require a jury trial as it relates to

8  the three aggravating factors mentioned above, and any of those

9  other aggravating factors relied on by the trial court, is

10 constitutionally inaccurate, for it is a misread of the

11 Cunningham holding and falls within the net of 28 U.S.C. §2254

12 (d)(1)(2)(Williams v Taylor, at 407)  Therefore, appellant's

13 five year upper term sentenced imposed for the second degree

14 robbery must be reversed.

15 Notwithstanding the above, a quick recitation of the factual

16 context of the Cunningham will reflect why this legal conclusion

17 reached by the BlackII court and the First Appellate District was

18 incorrect and contrary to and involve an unreasonable application

19 of federal law as determined by the U.S. Supreme Court.

20 In Cunningham, the defendant was convicted of continuing sexual

21 abuse of a minor, and received an upper term of 16 yrs. in prison

22 after six aggravating factors were found true and found to

23 outweigh a single mitigating factor.  The defendant challenged

24 his sentence on Blakely grounds and challenged five of the six

25 aggravating factors, but did not challenge the sixth one,

26 implictly conceding that the sixth factor was true.(Cunningham,at

27 861)

28 The Cunningham Court's ruling, despite the defendant's concession

1  that one aggravating factor was true, was not a simple remand to
2  the State Court of Appeal for further proceedings to determine
3  whether constitutional error occurred; it was a clear, resounding
4  statement.

5  "We reverse the disposition because the four year elevation based
6  on judicial factfinding denied petitioner his right to a jury
7  trial"(Id,at 860)  This ruling was made despite the fact that
8  the defendant took the stand and, by the virtue of his testimony,
9  admitted one of the aggravating factors(i.e., that the victim
10  relied on him as a caregiver.)

11  So,if BlackII's conclusion was correct, that it is permissible
12  to use the aggravating factors mentioned and relied upon by the
13  trial and state appellate courts to impose the upper term,
14  without a jury finding it to be true beyond a reasonable doubt
15  or appellant admitting to the aggravating factors; then there
16  was no Sixth Amendment error in Cunningham itself.  This so
17  because the Cunningham defendant admitted at least one aggravating
18  factor.  That simply was not true, as the Cunningham Court was not
19  leaving the issue of whether there was error in the hands of the
20  California Courts; it found error and remanded solely on the
21  issue of remedy.

22  It is not posible to reconcile BlackII and Cunningham.  Therefore,
23  BlackII was incorrectly decided, and must conform to the holding
24  in Cunningham. Hence, the only appropriate remedy is
25  resentencing.

26

27

28

1  III.  **DOES THE CA SUPREME COURT'S REQUIREMENT THAT ON REMAND**
       **APPELLANT'S RE-SENTENCING HEARING SHOULD BE GOVERNED BY A**
2      **CHANGE IN LAW VIOLATE THE EX POST FACTO CLAUSE OF THE STATE**
       **AND FEDERAL CONSTITUTION**
3

4  On March 30,2007, the California Legislature amended the CA

5  Determinate Sentencing Law(DSL) in response to the Cunningham

6  holding.  The amended version of CA P.C. §1170(b) gave the trial

7  court more discretion than under the former version to sentence

8  a defendant to any one of the three optional terms that it felt

9  best served the interest of justice.

10 In response to the statutory amendment, the CA Supreme Court, in

11 People v Sandoval(2007) 41 Cal.4th 825) was faced with the question

12 of what type of re-sentencing proceedings should be conducted in

13 those cases, like appellant, in which a Sixth Amendment error

14 requires reversal of an upper term sentence and a remand for

15 re-sentencing.

16 The CA Supreme Court answered the question by holding, though a

17 case may be remanded to the trial court for re-sentencing because

18 of a Cunningham violation, a trial court would be required to use

19 the amended sentencing scheme, and not the sentencing scheme in

20 effect/operable at the time of a defendant's initial sentencing

21 hearing. The CA Supreme Court has erroneously reasoned that such

22 onerous requirement is not a violation of the ex post facto

23 clauses of the State and Federal Constitution.  Appellant disagrees.

24 A law violates ex post facto clause only if it is relates back to

25 to events before the law's enactment, and if its application

26 disadvantages the offender.(Miller v Florida(1987) 482 US 423)

27 It is undisputed that appellant's initial sentencing hearing

28 took place before March 30,2007, and, hence, applying the amended

9

1  sentencing scheme would have a retroactive application.

2  "An unforeseeable judicial enlargement of a criminal statute,

3  applied retroactively, operates precisely like an ex post facto

4  law..."(Calder v Bull, 3 US 386)

5  "There can be no doubt that a deprivation of the right of a fair

6  warning can result not only from vague statutory language but

7  also from an unforeseeable and retroactive judicial expansion of

8  narrow and precise statutory language."(Bouie v City Columbia(1964)

9  378 US 347; Pierce v US, 314 US 306)

10  On March 30,2007, the California legislature responded to the

11  "Cunningham" decision by amending CA Penal Code §1170, which the

12  CA Supreme Court's BlackII holding has,without fair warning to

13  appellant, judicially expanded the amended statute so as to

14  apply retroactive to appellant though appellant's initial

15  sentencing hearing occurred prior to the enactment of the

16  amended statute in question. Hence, the CA Supreme Court's decision

17  to do so falls under the provision of 28 U.S.C. §2254(d)(1)(2).

18  Further, under the former sentencing scheme, absent the finding

19  of outweighing aggravating factors, it was mandatory that

20  appellant receive the statutory maximum of three years(middle term)

21  The amended sentencing scheme has taken away this three year

22  statutory maximum.

23  Even the finding and weighing of aggravating factor(s)

24  requirement has been stripped away by the amended sentencing scheme

25  This leaves appellant more disadvantaged/vulnerable to the

26  arbitrary and capricious imposition of the higher term by the

27  trial court, with no formal and/or narrowly tailored rules/laws to

28  govern thecircumstances in which this higher term can be imposed or

1 mandate that the middle term will be imposed when the appropriate
2 circumstances existed.

3 The former sentencing scheme and its related Cal.Rules of Crt.
4 provided a more favorable safety net.  Consequently, it is clear
5 that, on remand, subjecting petitioner to the rigors of the
6 revised/amended sentencing scheme works to appellant's
7 disadvantage and violates ex post facto laws.

8 **IV. DID THE TRIAL COURT DENY PETITIONER'S CONSTITUTIONAL RIGHT TO**
  **HAVE JURY DETERMINE BEYOND A REASONABLE DOUBT AGGRAVATING**
9 **FACTORS WARRANTING A CONSECUTIVE SENTENCE WHICH RESULTS IN A**
  **SENTENC BEYOND THE STATUTORY MAXIMUM**
10

11 In the case at bar, the trial court imposed the high term of five
12 years.  Though appellant contends that the middle term should have
13 been imposed, his position is that whether the high or middle term
14 was imposed, all other counts should have been run concurrent with
15 the robbery count.

16 This so because a consecutive sentence is a sentence enhancement
17 that requires the court, not a jury, to find aggravating factors
18 by a preponderance of evidence rather than beyond a reasonable
19 doubt.

20 "A consecutive sentence is an enhancement, and imposition of
21 consecutive sentence is a sentence choice requiring a statement of
22 reasons."(People v Powell(1980) 161 Cal.Rptr.803; People v Reeder
23 (1984) 152 Cal.App.3d 900,919; People Torres!987) 188 Cal.App.3d
24 723,736; People v Lewis(1991) 229 Cal.App.3d 259)

25 Again it is helpful and paramount to reinterate the Cunningham
26 Court's adoption and reliance on Apprendi v New Jersey: "....**any**
27 **fact**(other than a prior conviction) that exposes a defendant to a
28 sentence in excess of the relevant statutory maximum **MUST BE**

1  found by a jury, not a judge, and established beyond a reasonable
2  doubt, not merely by a preponderance of evidence."(Apprendi at pg.
3  490)

4  Because a consecutive sentence imposes on appellant a prison
5  term beyond the statutory maximum, appellant had a constitutional
6  right to have a jury, not a judge, decide beyond a reasonable
7  doubt, whether the necessary aggravating factors, pursuant to Cal.
8  Rules of Crt. 4.425, existed justifying running all other counts
9  consecutive to the robbery count.  Hence, the CA consecutive
10  setencing scheme is unconstitutional and a violation of appellant's
11  6th and 14th Amendment rights.

12  **WHEREFORE PETITIONER PRAYS:**

13  1.That the petition be granted in full;

14  2.That an order to show cause issue;

15  3.That CA Supreme Court's BlackII and Sandoval decisions be
   struck down as in violation of Cunningham;

16  4.That the case be remanded to the trial court with instructions
   to impose the middle term;

17  5.That an amended abstract of judgment be prepared reflecting that
18  appellant's sentence has been modified and sent to the California
   Dept.of Corrections and Rehabilitation(CDCR);

19  6.The Court grant any other relief deemed appropriate.

20  I declare under the penalty of perjury that the above mentioned is
   true and correct to the best of my knowledge.

21
22  Dated: 3-11-08                          Ceariaco Cabrellis

23
24
25
26
27
28

*Exhibit #1*

Filed 7/11/06



## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

### DIVISION FIVE

**FILED**

JUL 1 1 2006

Court of Appeal - First App. Dist.
DIANA HERBERT
By_____

| | |
|---|---|
| **THE PEOPLE,** | |
| **Plaintiff and Respondent,** | **A105385** |
| v. | |
| **RICKY RENEE SANDERS et al.,** | **(Alameda County Super. Ct. No. C144018)** |
| **Defendants and Appellants.** | |

Ricky Renee Sanders and Ceariaco Cabrellis took over a Cambridge Soundworks store in Berkeley, held the employees at gunpoint, robbed them, and removed a truckload of equipment. Both defendants appeal their convictions.

### PROCEDURAL BACKGROUND

A jury found defendants Ricky Sanders and Ceariaco Cabrellis guilty of one count of second degree commercial burglary (Penal Code § 459[1]); two counts of second degree robbery (§ 211); two counts of false imprisonment (§ 236); two counts of attempting to dissuade a witness (§ 136.1, subd. (b)(2)); and one count of cutting a utility line (§ 591). The jury also found several enhancements true.

The trial court sentenced Sanders to nine years eight months in prison and sentenced Cabrellis to 14 years four months.

---

[1]   All further statutory references are to the Penal Code unless otherwise indicated.

FACTUAL BACKGROUND

Prosecution Case

At around 11:40 a.m. on Sunday September 15, 2002, David Divjak arrived at his place of work, Cambridge Soundworks in Berkeley. He looked out a window in the bathroom at the back of the store and noticed a U-Haul truck being backed into a parking space in the alley behind the store. At trial, Divjak identified defendant Sanders as the driver of the truck.

Ryan Antonelli, another employee, joined Divjak at the store. After a little while a young man entered the store carrying a gun. The gunman led Divjak and Antonelli to the rear bathroom and took their wallets. He said he was taking the wallets so that he would know who they were and where they lived. He forced them to the floor and tied Antonelli's hands behind his back with plastic ties. A second man entered the bathroom and tied Divjak's hands. The second man said, "Now we have your wallets. You guys need to cooperate with us." When the wallets were eventually recovered after the robbery, money was missing from both. At some point, Antonelli's head was covered with a cardboard box and Divjak's head was covered with a sweater. Divjak could see through the sweater.

At trial, Divjak identified defendant Cabrellis as the second man, whom he referred to as "Mr. Friendly." Mr. Friendly was telling the other robbers which items to take. Divjak and Antonelli told Mr. Friendly how to open the store's safe, and he removed around $1,800 or $2,800. The robbers used dollies to move various merchandise out the back of the store. The retail value of the stolen items was over $78,000.

The robbers left shortly after 1:30 p.m. Divjak tried to dial 911, but the phone line had been cut. He used a different telephone and reported that two or three African-American males had left in a U-Haul truck.

Police pursued a U-Haul truck matching the broadcast description and detained Sanders, who was the driver. The truck was loaded with the stolen Cambridge

2

Soundworks property. At a show-up identification, Divjak said that he was "absolutely positive" that Sanders was the person that he had seen in the U-Haul truck. Antonelli was unable to make an identification because he did not see the faces of anyone other than the gunman.

Subsequently, Divjak viewed two photographic lineups. In the second lineup, which included a photograph of defendant Cabrellis, Divjak identified Cabrellis as "Mr. Friendly." Cabrellis was arrested and interviewed by Detective Chris Stines. Cabrellis claimed he had been with Tami Keathley on September 15 between the hours of 11:00 a.m. and 2:00 p.m. He offered varying accounts of his activities on September 14 and after 2:00 p.m. on September 15.

Cabrellis said that he always had to have an alibi when he went out because people falsely accused him of crimes. He admitted that he had a history of involvement in burglaries and robberies and referred to himself as a "superman" of the field. He claimed that he had not been active for over two years. He said that in the past he used embezzled U-Haul trucks for burglaries and that a typical crew would be three to four people. He said that he never touched guns and that he was a "gentleman type" or "sergeant" who gave orders to others. Cabrellis described himself as a "middleman" who would take orders for merchandise, go obtain the items, and then sell them. He also said he had heard about the Cambridge Soundworks robbery and he described the stolen electronics as "everyday orders."

When the police searched Cabrellis' residence in Sacramento, they found a small notebook listing stereo and electronic equipment. Detective Stines offered his opinion that the list was a pay/owe book for stereo and electronic equipment.

In a police interview Tami Keathley denied being around Cabrellis on the date of the robbery. At trial, Keathley was unsure whether she was with Cabrellis on September 15.

Sanders' Defense

Sanders testified that on September 15 he was in Berkeley at the library. A friend corroborated this story, testifying that she dropped him off at the library a little before

3

1:00 p.m. Afterwards, while walking to a nearby bookstore, he saw men loading a U-Haul truck. One of them offered him $40 to drive the truck; he accepted. He said that the back of Cabrellis' head was similar to that of a man he saw in the alley only from behind, but he was not sure it was Cabrellis.

Cabrellis' Defense

Dawn Ragsdale and her brother Mark testified that they went out bowling and dancing with Cabrellis the night of September 14. At about 1:00 or 2:00 a.m., they went to eat at Denny's. At the restaurant, Cabrellis ran into a friend, Larry White, and bought a Rolex watch from him. Afterwards, Ragsdale and Cabrellis went to a Holiday Inn in Fairfield. When they got to the hotel Cabrellis inspected the watch, concluded that it was a fake, and told Ragsdale that he was going to return the watch the next day. She left the hotel at 9:00 a.m. on Sunday September 15 and Cabrellis called her at 10:40 a.m. from the hotel. According to the hotel records, the hotel room was vacated before 11:00 a.m.

Larry White testified that he saw Cabrellis at Denny's the night of September 14. He could not recall what time it was, but he went to Denny's after he closed his karate school between 8:30 and 9:00 p.m. He sold Cabrellis a Rolex watch he had purchased in China. The next day, September 15, he got a voicemail from Cabrellis saying that he wanted his money back. Based on his phone records, White testified that he called Cabrellis back at 11:46 a.m. He met Cabrellis at his karate school in Fairfield about 15 minutes later and refunded Cabrellis' money.

Gerardo "Lalo" Ponce testified that on September 15 Cabrellis came to his house in Vacaville, arriving between 11:45 a.m. and 12:30 p.m. Cabrellis stayed for 45 minutes to an hour, during which he made a long phone call. Cabrellis' friend Monte was with him. They left sometime around 1:00 p.m.

Frances Cabrellis, defendant Cabrellis' mother, testified that, based on her phone records, she called Cabrellis at 1:03 p.m. on September 15, asking him to help her move a chair. She lived in Suisun City. Cabrellis was there in 20 to 25 minutes, accompanied by Monte.

4

Lamont "Monte" Norman testified that it was around 10:30 a.m. when they arrived at Frances Cabrellis' home. They stayed for about an hour. Afterwards, they went to the apartment of a woman named April in Suisun, then to Larry White's martial arts business in Fairfield. Cabrellis bought a watch from White. Then they went to Lalo's house in Vacaville, arriving between 12:30 and 1:00 p.m. Cabrellis talked to Tami Keathley on the phone for over an hour. They left between 2:00 and 2:30 p.m.

In cross-examining Tami Keathley during her testimony for the prosecution, Cabrellis' counsel showed her a telephone bill showing a 60-minute phone call to her from Cabrellis on September 15, starting at 11:42 a.m. Keathley's testimony about the call was unclear. She acknowledged that her telephone bill reflected such a call. At first she testified that she did not remember talking to Cabrellis on that date, then she testified that she did talk to him but she did not recall what they spoke about.

Nancy French, Cabrellis' girlfriend and co-habitant and the mother of his child, testified that she contacted Cabrellis on September 15 at 12:51 p.m. and he said he was in Fairfield. He returned home at about 5:00 p.m. with his friend Monte.

Several witnesses testified that Cabrellis has problems with his memory due to a car accident.

### DISCUSSION

I.     *Cabrellis' Instructional Claims*

Defendant Cabrellis makes three claims of instructional error. We discuss each in turn.

A.     *CALJIC No. 2.28*

Section 1054.3 requires the defense to disclose to the prosecution the names of witnesses they intend to call, any written or recorded statements by those witnesses, and any real evidence the defense intends to offer at trial. Before trial Cabrellis' counsel did not disclose Ragsdale's written statement nor a number of phone records. At trial she refreshed the recollections of defense witnesses with the undisclosed documents.

5

Under section 1054.5, subdivision (b), a trial court may advise the jury of any
untimely disclosure. On the prosecution's request, the trial court instructed the jury using
CALJIC No. 2.28: "The prosecution and the defense are required to disclose to each
other before trial the evidence each intends to present at trial so as to promote the
ascertainment of the truth, save court time and avoid any surprise which may arise during
the course of the trial. Concealment of evidence may deny a party a sufficient
opportunity to subpoena necessary witnesses or produce evidence which may exist to
rebut the non-complying party's evidence. . . . [¶] . . . In this case, the Defendant
Cabrellis concealed the following evidence: a one page hand-written statement of Dawn
Ragsdale, and the following telephone record exhibits: Defendant B's 2, Defendant B's 3,
Defendant B's 7, Defendant B's 10, Defendant B's 11, and Defendant B's 12.[¶]
Although the Defendant's concealment was without lawful justification, the Court has,
under the law, permitted the production of this evidence during this trial.[¶] The weight
and significance of any concealment are matters for your consideration. However, you
should consider whether the concealed evidence pertains to a fact of importance,
something trivial or subject matters already established by other credible evidence."
Defendant contends that instructing the jury with CALJIC No. 2.28 was prejudicial error.

CALJIC No. 2.28 has been criticized repeatedly by the Courts of Appeal. (See
*People v. Lawson* (2005) 131 Cal.App.4th 1242, 1247-1248.) Under the reasoning of the
cases, the instruction given by the trial court was problematic for several reasons. It
falsely informed the jury that Cabrellis was responsible for the violation. There is
nothing in the record showing that he bore any responsibility for his counsel's late
disclosure. (*People v. Bell* (2004) 118 Cal.App.4th 249, 254-255, 257.) It invited the
jury to speculate as to the consequences of violation of the discovery statute, without any
information (outside of the prosecutor's argument) that the prosecution was put at an
actual disadvantage because of the late discovery. (*Id.* at pp. 255, 257.) It told the jury to
evaluate the weight and significance of the discovery violation without providing any
guidance on how to do so; in other words, it implied that the jury should "do something"
about the violation but gave them no idea what that something should be. (*Ibid.*) It failed

6

to warn the jury that the discovery violation, standing alone, was insufficient to support a guilty verdict. (*Id.* at p. 257.)

For these reasons, "[w]ith rare exception, CALJIC No. 2.28 should not be given without providing the jury some guidance as to how it should consider the discovery violation. The form of this guidance by necessity will differ from case to case. At the very least, it should include a warning that the jury cannot infer a consciousness of guilt from the discovery violation." (*People v. Lawson, supra,* 131 Cal.App.4th at p. 1248.)[2] A warning was especially appropriate here because nothing in the record suggests that Cabrellis, as opposed to his defense lawyer, was responsible for the discovery violation; yet the instruction states "defendant" was responsible for the "concealment." (*Ibid.*) The trial court erred in giving CALJIC No. 2.28.

The error requires reversal of Cabrellis' conviction if is it is reasonably probable that the jury would have reached a result more favorable to him had it not been instructed with CALJIC No. 2.28. (*People v. Bell, supra,* 118 Cal.App.4th at p. 257.)

Cabrellis argues that the jury could have rejected the late-produced phone records as a sanction for the discovery violation.[3] (See *People v. Bell, supra,* 118 Cal.App.4th at p. 257; *People v. Cabral* (2004) 121 Cal.App.4th 748, 753.) That, in turn, would have undermined the testimony of the alibi witnesses who relied on the phone records to refresh their recollections.[4]

---

[2]  New instructions developed by the Judicial Council Task Force on Jury Instructions went into effect in January 2006; Instruction 306 addresses discovery violations in a more narrow and careful fashion.

[3]  The instruction also potentially undermined the testimony of Dawn Ragsdale. However, because she did not testify that she saw defendant at the time of the robbery, her testimony was not critical to Cabrellis' alibi.

[4]  One of the phone records was actually used during the cross-examination of prosecution witness Tami Keathley. When presented with the phone record she eventually stated she spoke to Cabrellis on September 15, starting at 11:42 a.m. However, that testimony was of questionable benefit to Cabrellis because the prosecutor used the evidence of that uninterrupted hour long phone call to undermine Larry White's

7

Cabrellis' defense was built on the four alibi witnesses who testified they saw him during the time of the robbery. Those witnesses were Frances Cabrellis, Larry White, Gerardo Ponce, and Lamont Norman. Only Frances Cabrellis and Larry White used phone records to refresh their recollections regarding the times they spoke to Cabrellis on September 15. Even if we assume that the jury entirely disregarded their testimony due to CALJIC No. 2.28, the testimony of Gerardo Ponce and Lamont Norman was unaffected by the erroneous instruction. The jury rejected the testimony of all four of the alibi witnesses, even though Ponce and Norman were not subjected to any significant impeachment. The jury evidently believed that none of Cabrellis' critical alibi witnesses were reliable and the entire alibi was a fabrication. It is unlikely the outcome would have been different had the jury relied on the phone records because the records themselves were meaningless without reliable testimony explaining their significance.

It is also important to note that Cabrellis' counsel implored the jury not to punish her client for her failure to disclose. She stated, "the DA rightfully criticized me for failing to provide certain evidence sooner than I should have. That was my fault. Not in any way my client's fault. There is absolutely no evidence that my client in any way concealed or delayed in providing any evidence. The evidence does show, to the contrary, that all evidence was provided by the witnesses to either the former attorney or to me. My client has been in custody—in case you haven't noticed—for the entire time. He has not had the power and control over any decisions in this trial. Any mistakes, any errors are mine, and I want to make sure that any mistakes or errors made by me do not reflect in any way on my client. This is far too serious a matter to let any missteps of an attorney affect the proper evaluation and weight of the evidence."

She repeated that plea near the end of her argument, following the prosecutor's objection to her argument that the DA had failed to find anything to impeach the credibility of the alibi witnesses. The trial court sustained the objection and advised the

---

critical testimony that at 11:46 a.m. on September 15 he spoke to and arranged a meeting with Cabrellis.

8

jury that counsel's argument misstated the evidence because, due to the concealment of evidence, the prosecution "has not had an opportunity to properly investigate the backgrounds of your witnesses." The court's statement was inaccurate because the concealment related to the phone records, not to the identity of the witnesses. Cabrellis' counsel then told the jury, "[w]hat the DA would have done, to my understanding, is run records, run a rap sheet, and I'm not aware of any felony convictions. If there were felony convictions, I believe you would have heard of them. And that's what I was trying to say."

As read to the jury, CALJIC No. 2.28 was expressly limited to the phone records and the prior statement by Ragsdale. Moreover, the prosecutor did not emphasize the instruction in his closing argument or suggest that the concealment undermined all of Cabrellis' alibi witnesses. (Cf. *People v. Bell*, *supra*, 118 Cal.App.4th at p. 257.) The prosecutor's only reference to the issue came during his rebuttal, when he stated that had he had the phone records earlier he could have subpoenaed someone from the phone company to explain them.

Finally, in assessing the effect of the erroneous instruction, we consider that the prosecution's case was strong. Divjak repeatedly and confidently identified Cabrellis as "Mr. Friendly." He had ample opportunity to see "Mr. Friendly" face-to-face at a close distance. An expert witness for the defense testified about the problems inherent in eyewitness identification, but the defense did not present anything about Divjak's background to undermine his credibility or suggest that he had a motive to lie.

Moreover, Divjak's identification was corroborated by other evidence. In his police interview, Cabrellis' described a modus operandi for robberies which bore a number of similarities to the Cambridge Soundworks robbery: the use of a U-Haul to carry the stolen goods, the size of the crew, and Cabrellis' role as a "middleman." Cabrellis description of himself as a "gentleman type" fit Divjak's description of Mr. Friendly as polite. Cabrellis' description of himself as a "sergeant" and the discovery of an apparent pay/owe book for stereos and electronics in Cabrellis' residence was consonant with Divjak's description of Mr. Friendly's role instructing others what items

9

to take. Cabrellis' assertion that he needed to have an alibi whenever he left the house certainly must have suggested to the jury that he fabricated an alibi for trial.

We conclude that it is not reasonably probable that the jury would have reached a result more favorable to Cabrellis had it not been instructed with CALJIC No. 2.28.

### B. *CALJIC No. 3.18*

Defendant Cabrellis contends that the trial court erred in refusing to give several cautionary instructions regarding accomplice testimony. The central instruction is CALJIC No. 3.18, which instructs that incriminating testimony by an accomplice is to be viewed with distrust: "To the extent that an accomplice gives testimony that tends to incriminate [the] [a] defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in this case."[5]

Trial courts are obligated to instruct the jury with the language in CALJIC No. 3.18 or its equivalent " 'whenever an accomplice, or a witness who might be determined by the jury to be an accomplice, testifies.' " (*People v. Box* (2000) 23 Cal.4th 1153, 1208.) Codefendant accomplices who testify are within the scope of the rule. (*Id.* at p. 1209.) The basis for the rule is that an accomplice's testimony is inherently " 'subject to the taint of an improper motive, i.e., that of promoting his . . . own self interest by inculpating the defendant.' " (*Ibid.*) The evidence clearly supported a conclusion that Sanders was an accomplice of Cabrellis. Divjak identified both as coparticipants. The trial court erred in failing to instruct the jury with CALJIC No. 3.18.

Respondent contends that the trial court did not err in failing to instruct with CALJIC No. 3.18 because Sanders' testimony did not incriminate Cabrellis.

---

[5]     The trial court also failed to instruct the defendant with CALJIC Nos. 3.11 and 3.12 regarding the need for corroboration of accomplice testimony. The error was harmless because Divjak's identification of Cabrellis was independent evidence connecting defendant with the crime. (See CALJIC No. 3.12.)

Respondent's argument is misplaced. Neither *Box, supra,* 23 Cal.4th 1153 nor *People v. Guiuan* (1998) 18 Cal.4th 558, 569, state that a trial court need only give the instruction where the testimony is incriminating. In fact, *Guiuan* sought to relieve trial courts of the burden of parsing the testimony of an accomplice to determine whether it was favorable or unfavorable; the wording of the instruction leaves it to the jury to determine what, if any, aspects of an accomplice's testimony are incriminating. *(Guiuan,* at p. 569.)

The error requires reversal of Cabrellis' conviction if is it is reasonably probable that the jury would have reached a result more favorable to him had it been instructed to view Sanders' testimony with caution. *(People v. Box, supra,* 23 Cal.4th at p. 1209.)

Sanders' defense was that he was an innocent passerby who was recruited to drive the U-Haul truck. Whether Cabrellis committed the crime was not relevant to the defense. Parts of Sanders' testimony were adverse to Cabrellis. Namely, Sanders testified that the back of Cabrellis' head was similar to that of a man he saw in the alley behind Cambridge Soundworks. Because he only saw the man from behind, he could not say for sure whether it was Cabrellis. But the absence of a cautionary instruction with regard to that testimony could not have prejudiced Cabrellis. The identification was so weak and tentative as to not constitute any identification at all. In closing, Sanders' counsel actually stated that his client "was not able to identify Mr. Cabrellis." The prosecution did not refer to that portion of Sanders' testimony in its closing arguments.

Sanders' testimony that while in jail awaiting trial Cabrellis offered to pay him for testimony and accused him of being a snitch was arguably more damaging than the identification. However, the jury was aware that Sanders had every motivation to make himself look like an innocent victim caught up in another's criminal enterprise. (See *People v. Box, supra,* 23 Cal.4th at p. 1209 [jury knew that codefendants "had every motivation to shift blame to each other"].) Also, Sanders was impeached with evidence of Sanders' forgery conviction. Inasmuch as the jury rejected nearly the entirety of Sanders' testimony in finding him guilty, there is little reason to think that the jury placed significant weight on his testimony about Cabrellis' statements in jail. The prosecution

did not use that testimony in arguing Cabrellis' guilt. The only reference to the testimony was in arguing Sanders' guilt.

We conclude it is not reasonably probable that the jury would have reached a result more favorable to Cabrellis had it been instructed with CALJIC No. 3.18. Our conclusion is the same when we consider the instructional errors cumulatively.

C.    *CALJIC No. 2.62*

Defendant Cabrellis contends that the trial court erred in instructing the jury with CALJIC No. 2.62 because the applicability of the instruction was not expressly limited to defendant Sanders and thus the jury was permitted to make inferences against defendant Cabrellis, who chose not to testify.

The trial court properly instructed the jury that a criminal defendant need not testify, that the jury must not draw any inference from a defendant's decision not to testify, and that a defendant may choose to rely on the state of the evidence and any failure by the prosecution to prove beyond a reasonable doubt every essential element of the charged offenses. The court then instructed the jury with CALJIC No. 2.62: "In this case a defendant has testified to certain matters.[¶] If you find that a defendant failed to explain or deny any evidence against him introduced by the prosecution which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of this evidence and as indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable.[¶] The failure of a defendant to deny or explain evidence against him does not, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt.[¶] If a defendant does not have the knowledge that he would need to deny or to explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain this evidence."

12

Preliminarily, we reject respondent's contention that Cabrellis forfeited his right to appellate review of this claim by failing to object below to the wording of the instruction. A defendant may challenge on appeal any instruction affecting his or her substantial rights, even in the absence of an objection before the trial court. (Pen. Code, § 1259; *People v. Brown* (2003) 31 Cal.4th 518, 539, fn. 7.)

"Challenges to the wording of jury instructions are resolved by determining whether there is a reasonable likelihood that the jury misapplied or misconstrued the instruction." (*People v. Crew* (2003) 31 Cal.4th 822, 848.) In the copy of the instructions given to the jury, CALJIC No. 2.62 is separated by over a half-inch of blank space from the preceding instructions about the right of defendants not to testify. It was clear that the phrase "in this case a defendant has testified" is associated with the language of CALJIC No. 2.62 and not with the preceding paragraphs. (See *People v. Davis* (1995) 10 Cal.4th 463, 542.)

The written instructions contain a handwritten correction changing the first sentence from "[i]n this case defendant has testified" to "[i]n this case *a* defendant has testified." (Italics added.) That change makes it clear that only one of the two defendants testified, and the jury could not have failed to understand that the reference was to defendant Sanders. Immediately thereafter, and not separated by any blank space, follows the language permitting the jury to make inferences from the failure of "a defendant" to explain certain matters. Finally, during closing argument Sanders' counsel indicated that the instruction applied to his client. No one suggested that the instruction was applicable to Cabrellis.

Although it would have been clearer had the trial court used defendant Sanders' name, the only reasonable interpretation of the instruction is that the language permitting the jury to make negative inferences only refers to the testifying defendant Sanders. "Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case." (*Conservatorship of Early* (1983) 35 Cal.3d 244, 253.) It is not reasonably likely that the jury understood the instruction as permitting it to make inferences from the nontestifying defendant Cabrellis' failure to explain certain matters.

13

In any event, courts have frequently found that the improper giving of CALJIC No. 2.62 constitutes harmless error because juries are instructed, pursuant to CALJIC No. 17.31, to "[d]isregard any instruction which applies to facts determined by you not to exist." *(People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472.) There was no reference made by the prosecution during closing argument to Cabrellis having failed to explain any matter, nor was there any reference to CALJIC No. 2.62. It is not reasonably probable that a result more favorable to Cabrellis would have been reached in the absence of the alleged error. *(People v. Watson* (1956) 46 Cal.2d at 818, 836.)

## II.    *Defendants' Section 654 Claims*

Both Sanders and Cabrellis contend that imposition of concurrent sentences for burglary, false imprisonment, and cutting a utility line violated the Penal Code section 654 prohibition of multiple punishment because all of the offenses were the means of facilitating one of two objectives, robbing the store or intimidating the employee witnesses.

Penal Code section 654, subdivision (a) provides in part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute has been interpreted to apply "when there is a course of conduct which violates more than one statute but constitutes an indivisible transaction." *(People v. Saffle* (1992) 4 Cal.App.4th 434, 438.) The purpose of section 654 is to ensure that a defendant's punishment is commensurate with his culpability. *(People v. Perez* (1979) 23 Cal.3d 545, 550-551.) "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." *(People v. Harrison* (1989) 48 Cal.3d 321, 335.) A court may impose multiple punishments where a defendant commits multiple crimes in pursuit of multiple independent, albeit simultaneous, objectives. *(People v. Douglas* (1995) 39 Cal.App.4th 1385, 1393.)

14

The trial court found that Cabrellis and Sanders harbored multiple independent objectives: "[T]he commission of a burglary such as what apparently was the plan, which was to enter into the Cambridge Soundworks and to take the—to steal high-end electronics, could have been conducted and maintained without the necessity of binding and moving these victims into the back room, without threatening their lives, without taking their identification and threatening their family members, and without robbing them individually . . . could have been done, also, without cutting the telephone lines and . . . attempting to dissuade the victims by threats of violence."

The determination of whether the facts and circumstances reveal a single objective within the meaning of section 654 is a factual determination which we review for substantial evidence. (*People v. Saffle, supra,* 4 Cal.App.4th at p. 438.) On the other hand, the "dimension and meaning" of section 654 is a legal question subject to de novo review. (*People v. Perez, supra,* 23 Cal.3d at p. 552, fn. 5.) Accordingly, where the issue is whether the evidence supports the trial court's findings regarding defendants' objectives, our review is for substantial evidence, but where the issue is whether the objectives articulated by the trial court or otherwise ascertainable from the undisputed facts support multiple punishment under section 654, our review is de novo.

*Burglary*

Defendants first contend that the trial court should have stayed the sentences on the burglary charge. Defendants rely on *People v. Smith* (1985) 163 Cal.App.3d 908, 912, which referred to "settled law" that section 654 bars punishment for both burglary and robbery "where the sole purpose of the burglary was to effectuate the robbery." In *Smith,* the armed assailants entered a bar and stole money from the register and a bottle of rum. (*Smith,* at p. 910.)

Defendants also rely on *People v. Garrison* (1966) 246 Cal.App.2d 343. There, two armed men surprised a group of people returning from dinner, robbed several of personal property, and ransacked the house belonging to two of the victims. The court held that defendant could not be punished for the burglary in addition to the three counts of armed robbery. (*Id.* at p. 357.)

15

In contrast, here, the trial court found that the objective of the burglary was to steal electronics from the store, while the objective of the robbery was to steal the personal property of the employees and to intimidate them by taking their identification. Those findings are supported by substantial evidence. Further, the objective of stealing from the individual employees was so distinct in nature from stealing merchandise from the store that it was proper to impose a separate punishment under section 654.

*False Imprisonment*

Defendants next contend that the trial court should have stayed the sentences on the false imprisonment charges. We agree. The trial court finding that the burglary could have been "conducted and maintained without the necessity of binding and moving these victims into the back room" is not supported by the record. The defendants were moving electronics out of the store for over an hour; it was necessary to somehow incapacitate the employees so that they would not interfere or escape and raise an alarm.

Defendants' position is supported by *People v. Han* (2000) 78 Cal.App.4th 797, 800, which involved a home invasion robbery during which the victims were tied up and moved into a bathroom. The court stayed defendant's sentence for false imprisonment where defendant was also sentenced for burglary. (*Id.* at pp. 799, 809.) Also instructive is *People v. Foster* (1988) 201 Cal.App.3d 20, 27-28, in which separate punishment for false imprisonment was appropriate where it occurred only after the robbers obtained all the money and where the victims were placed in danger by being locked in a store cooler. The court stated that the act was "analogous to a needless or vicious assault committed after a robbery." (*Id.* at p. 27.) In contrast, the employees in this case were imprisoned while the theft was ongoing and the location of confinement was not inherently dangerous.

Respondent suggests that the objectives of the false imprisonment were to facilitate the theft of store merchandise, to facilitate the robberies, to intimidate them as potential witnesses, and to permit escape. The record supports the conclusion, but these are not independent objectives: all are encompassed within the objectives underlying the offenses of burglary, robbery, and dissuading witnesses.

16

Because the false imprisonment offenses were incidental to the other offenses, the sentences imposed for false imprisonment must be stayed.

*Cutting a Utility Line*

Finally, defendants contend that the trial court should have stayed the sentences for cutting a utility line. Again, we agree. Respondent suggests that defendants cut the phone line to facilitate their escape by slowing any attempt to contact the police. And, again, that is not an objective independent of the objectives of the burglary and robberies. Encompassed within defendants' intent to take the store's property and the victims' wallets was an intent to escape from the premises with the property. Cutting the phone line merely facilitated successful completion of the burglary and robberies by delaying notification of the police. No other objective was argued or articulated by the trial court and defendant's conduct was not the type of violent or gratuitous criminal act which may justify separate punishment under the reasoning of *People v. Nguyen* (1988) 204 Cal.App.3d 181, 189-191.

The sentences imposed for cutting the phone line must be stayed.

III.    *On-Bail Enhancements to Cabrellis' Sentence*

Section 12022.1 provides that a two-year enhancement shall be imposed when a defendant commits a felony while on bail and is convicted of felonies in both cases. Cabrellis contends that the trial court erroneously imposed multiple eight-month consecutive terms under section 12022.1. Respondent concedes that all section 12022.1 enhancements must be stricken.[6]

IV.    *Defendants' Blakely Claims*

Cabrellis contends that the trial court erred in imposing the upper term for robbery and consecutive prison terms. Sanders contends that the trial court erred in imposing

---

[6]    We grant respondent's November 21, 2005, request for judicial notice of the minute order reflecting dismissal of the case for which Cabrellis was on bail.

consecutive prison terms and separate sentences rather than staying sentences under section 654. Citing *Blakely v. Washington* (2004) 542 U.S. 296, appellants argue that the court violated their Sixth Amendment rights because in making those choices it relied on facts neither admitted by appellants nor found true by the jury beyond a reasonable doubt. On June 20, 2005, the California Supreme Court held that the imposition of upper term and consecutive sentences under California's determinate sentencing scheme does not violate a defendant's Sixth Amendment rights under *Blakely*. (*People v. Black* (2005) 35 Cal.4th 1238, 1244.) Similarly, because section 654 potentially reduces the defendant's aggregate sentence when it applies and does not increase the statutory maximum term for each separate offense when it does not (see *People v. Cleveland* (2001) 87 Cal.App.4th 263, 270), *Blakely* does not require that the section 654 determination be made by the jury. (*People v. Black,* at pp. 1263-1264.) Accordingly, we deny appellants' *Blakely* claims.

<div align="center">DISPOSITION</div>

The judgment is modified to stay the sentences imposed on Sanders and Cabrellis for false imprisonment and cutting a utility line, including any enhancements. The stay becomes permanent upon each defendant's service of the remainder of his sentence. All enhancements imposed on Cabrellis pursuant to section 12022.1 are stricken. As so modified, the judgment is affirmed. The trial court shall send a corrected abstract of judgment to the Department of Corrections.

_____

GEMELLO, J.

We concur.

_____

JONES, P.J.

_____

SIMONS, J.

*People v. Sanders et al. (A105385)*

Exhibit #2

Court of Appeal, First Appellate District, Div. 5 - No. A105385
**S145838**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

RICKY RENEE SANDERS et al., Defendants and Appellants.

SUPREME COURT
FILED

OCT 18 2006

Frederick K. Ohlrich, Clerk

DEPUTY

Petitions for review denied without prejudice to any relief to which defendant might be entitled after the United States Supreme Court determines in *Cunningham v. California*, No. 05-6551, the effect of *Blakely v. Washington* (2004) 542 U.S. 296 and *United States v. Booker* (2005) 543 U.S. 220, on California law.

George, C. J., and Baxter, J., were absent and did not participate.

WERDEGAR

Acting Chief Justice

Exhibit #3

Filed 9/19/07                                                    COPY

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE



| | |
|---|---|
| **THE PEOPLE,** | |
| **Plaintiff and Respondent,** | **A105385** |
| **v.** | |
| **CEARIACO CABRELLIS,** | **(Alameda County** |
| **Defendants and Appellants.** | **Super. Ct. No. C144018)** |

On March 19, 2007, the United States Supreme Court granted a petition for writ of certiorari filed by defendant Ceariaco Cabrellis, vacated the judgment, and remanded the matter to this court for further consideration in light of *Cunningham v. California* (2007) 549 U.S. ___ [127 S.Ct. 856] (*Cunningham*). *Cunningham* concluded that California's determinate sentencing law violates the Sixth Amendment because it "allocates to judges sole authority to find facts permitting the imposition of an upper term sentence." (*Id.* 127 S.Ct. at p. 870.) Following the California Supreme Court's recent decision in *People v. Black* (2007) 41 Cal. 4th 799 ("*Black II*"), we affirm the judgment.

### BACKGROUND

In July 2006, we issued an opinion affirming defendant Ceariaco Cabrellis' convictions for a variety of offenses relating to the robbery at gunpoint of an electronics store in Berkeley. (See *People v. Sanders et al.* (July 11, 2006, A105385) [nonpub. opn.].) Relying on *People v. Black* (2005) 35 Cal.4th 1238, certiorari granted and

1

judgment vacated by *Black v. California* (2007) 549 U.S. ___ [127 S.Ct. 1210], we rejected defendant's argument that his right to jury trial was violated by the imposition of the upper term for the robbery conviction and consecutive prison terms on the other counts based on the aggravating factors found by the trial court.

Pursuant to the United States Supreme Court's March 2007 mandate, we recalled our October 2006 remittitur as to defendant Cabrellis. We have reexamined our initial opinion, which we incorporate by reference, and have received supplemental briefing from the parties.

<div align="center">DISCUSSION</div>

In *Black II*, the California Supreme Court reexamined the state determinate sentencing law in light of *Cunningham, supra*, 549 U.S. ___ [127 S.Ct. 856]. *Black II* noted that in *Blakely v. Washington* (2004) 542 U.S. 296, the high court "explicitly recognized the legitimate role of 'judicial factfinding' in indeterminate sentencing, in which the judge may 'implicitly rule on those facts he deems important to the exercise of his sentencing discretion.' " (*Black II, supra*, 41 Cal.4th at pp. 812-813.) Accordingly, *Black II* concluded that "so long as a defendant is *eligible* for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury." (*Id.* at p. 813.) The Court added that "[t]he facts upon which the trial court relies in exercising discretion to select among the terms available for a particular offense 'do not pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.' " (*Ibid.*) Because "the existence of a single aggravating circumstance is legally sufficient to make

<div align="center">2</div>

the defendant eligible for the upper term" under California's determinate sentencing law, "if one aggravating circumstance has been established in accordance with the constitutional requirements set forth in *Blakely*, the defendant is not 'legally entitled' to the middle term sentence, and the upper term sentence is the 'statutory maximum' " for Sixth Amendment purposes. (*Ibid.*)

Applying those conclusions to the facts before the Court, *Black II* noted that the United States Supreme Court "consistently has stated that the right to a jury trial does not apply to the fact of a prior conviction. . . . 'recidivism . . . is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence.' " (*Black II*, *supra*, 41 Cal.4th at p. 818 [citations omitted].) The Court held that the defendant's criminal history alone rendered him eligible for the upper term sentence, stating "defendant's criminal history and the jury's finding that the offense involved the use of force or violence establish two aggravating circumstances that *independently* satisfy Sixth Amendment requirements and render him eligible for the upper term. Therefore, he was not legally entitled to the middle term, and his Sixth Amendment right to jury trial was not violated by imposition of the upper term sentence. . . ." (*Id.* at p. 820, italics added.)

Similarly, in the present case the trial court relied on recidivism factors in sentencing defendant to the upper term of five years for the Penal Code section 211 conviction for second degree robbery. In selecting the upper term, the trial court cited the following factors relating to defendant's record: (1) defendant's prior convictions as an adult are numerous; (2) defendant has served prior prison terms or a prior prison term, and (3) defendant's prior performance on probation and parole was unsatisfactory. Defendant acknowledges that the trial court relied on recidivism factors in imposing the upper term. Under *Black II, supra*, 41 Cal.4th 799, these were permissible court findings for Sixth Amendment purposes, and the findings rendered defendant eligible for the

3

upper term. Defendant suffered no Sixth Amendment violation by the trial court's exercise of its discretion in selecting the upper term.[1]

DISPOSITION

The judgment is affirmed.

---

[1]    Defendant also contended on appeal that imposition of consecutive prison terms violated the Sixth Amendment. *Cunningham, supra,* 549 U.S. ___ [127 S.Ct. 856], did not address that issue, so it is not within the scope of our review on remand. In any event, *Black II* concluded that imposition of consecutive terms does not implicate a defendant's Sixth Amendment rights. (*Black II, supra,* 41 Cal.4th at pp. 820-823.)

4

Exhibit #4

Court of Appeal, First Appellate District, Div. 5 - No. A105385

**S157547**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

CEARIACO CABRELLIS, Defendant and Appellant.

The petition for review is denied.

SUPREME COURT
**FILED**

NOV 2 8 2007

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice

Exhibit #5

```
 1                    P R O C E E D I N G S

 2           Wednesday, February 11, 2004 -- 9:17 a.m.

 3                          ---o0o---

 4           THE COURT:  Calling docket 144018.  This is

 5   Mr. Cabrellis, is B on that docket number.

 6           Counsel, appearances for the record, please?

 7           MR. KUBO:  Deputy District Attorney Lance Kubo

 8   for the People.

 9           MS. BURNS:  Melina Burns for Mr. Cabrellis.

10           THE COURT:  This matter is on for Report and

11   Sentence.

12           There is also another pending file in docket

13   3569 -- actually, no.  It's the H-32759C.  That's the

14   pending Felony Second Degree Burglary with five priors,

15   prior felony convictions, alleged as to Mr. Cabrellis;

16           The second case is of importance, because it's

17   still a pending case.  Also, because I understand there

18   is also an offer that the DA's Office has extended to

19   Mr. Cabrellis, and I want to make sure that all parties

20   are aware of what the offer is.

21           Mr. Kubo, would you like to state the terms

22   and conditions?

23           MR. KUBO:  Yes, Your Honor.  The offer that

24   the People extended today was that Mr. Cabrellis would

25   plead to a lesser-included of the 459 Second in the

26   Hayward docket, and that will be the charge of Attempted

27   Burglary in the Second Degree, and he would admit the

28   priors.  The offer would be that he would receive
```

1  concurrent time for that plea and in that case, and that

2  means there would be no additional jail time or prison

3  time.  Whatever time he would receive, that would be

4  served concurrently with the sentence here.

5          THE COURT:  So the normal range of 459

6  Commercial Second Degree is sixteen months, two, or

7  three years in State Prison.  As an Attempted, this

8  would be eight months -- eight months, one year, or one

9  and a half years, plus the five prior felony

10  convictions:  Two are State Prison convictions, State

11  Prison sentences.

12          So would he get two years, one for each of

13  these, Mr. Kubo?

14          MR. KUBO:  I would believe it would be one

15  year each, Your Honor.

16          THE COURT:  Per 667.5 of the Penal Code.

17          So he would get one and a half years of the

18  upper term, an Attempted 459, plus one year on the --

19  pursuant to 667.5 for the State prison prior.  Total of

20  two and a half years would be the sentence,

21  Mr. Cabrellis.  And this would run concurrent with the

22  sentence that you are to receive on the case today.

23          Anything else?

24          MR. KUBO:  In addition, Your Honor, I believe

25  there was a 12022.1 issue in our case.  And what we

26  would be willing to do is to request the Court impose

27  only the two-year term, the mandatory, consecutive

28  two-year term, on the First Count and on the remaining

1  Seven Counts.

2          We would request the Court strike or stay

3  the --

4          THE COURT:  I would suspend.

5          MR. KUBO:  Or suspend the sentence on the

6  remaining Seven Counts.

7          I believe that would -- I believe we talked

8  about the -- his overall exposure should he be found

9  guilty of the other case would be in excess of 10 years.

10 And instead, he would be admitting -- after his plea, he

11 would probably get a two-year sentence for a total of

12 two more.

13         THE COURT:  Then would -- also, that exposure

14 would be consecutive rather than concurrent.

15         So Mr. Cabrellis, Ms. Burns, my understanding,

16 you've discussed this with your client already?

17         MS. BURNS:  I did, Your Honor.  And in light

18 of the fact there would be no additional time to be

19 served, I did recommend that the case be resolved in

20 this way.  My client indicated he is not interested in

21 resolving the case on those terms.

22         THE COURT:  Mr. Cabrellis, do you have any

23 questions about what the DA's Office did?  About the

24 only thing would be in the future, of course, you would

25 have this as a State Prison, additional felony

26 conviction.  The Attempted Commercial Burglary would add

27 one year consecutive to any other case you may pick up

28 in the future.  That would be the only effect on your

```
 1   record.  In the future if you pick up another case, get
 2   one year consecutive for the Hayward case.  I'm
 3   referring to the second case.
 4           Do you have any -- do you understand that,
 5   sir?
 6           THE DEFENDANT:  Yes, I do.
 7           THE COURT:  Do you understand everything
 8   Mr. Kubo and I, Ms. Burns, indicated about the proposed
 9   disposition of the pending case?
10           THE DEFENDANT:  Yes, I do.
11           THE COURT:  Do you have any questions about
12   this proposed disposition?
13           THE DEFENDANT:  I can't do nothin', because I
14   didn't do either of, so get your time.  That's it.
15           THE COURT:  Do you have any questions,
16   Mr. Cabrellis, about the proposed disposition?
17           THE DEFENDANT:  No.  I don't have no
18   questions, no.
19           THE COURT:  Do you need any more time to
20   discuss the proposed disposition with your attorney?
21           THE DEFENDANT:  Yes, I am.  I just come in,
22   jammed in.  I don't know what -- I don't even know what
23   I'm facing.  I don't know.
24           THE COURT:  We just told you, Mr. Cabrellis.
25           THE DEFENDANT:  I mean, I don't know my time
26   facing.  I don't know if this carry a Strike.  I don't
27   even know nothin'.
28           THE COURT:  This is not a Strike.  I just told
```

1  you, Mr. Cabrellis.  The additional future exposure, if

2  you picked up another felony case, and this case is

3  alleged as a prior felony conviction, would be one year

4  in addition to whatever else the sentencing would be in

5  that future felony case.  The current exposure would be

6  the two and a half years concurrent.  You would serve it

7  at the same time you could serve the sentence I'm going

8  to impose on you today on the case for which you were

9  convicted in front of the jury.

10       THE DEFENDANT:  Yeah.  That's what I'm talking

11  about, the convicted case.  Don't know if that carry a

12  Strike or what.  I don't know.

13       THE COURT:  That has nothing to do with the

14  proposed disposition of this case.

15       THE DEFENDANT:  Okay.

16       THE COURT:  So the case I'm talking about now,

17  the pending case, the Commercial Burglary of the

18  Soundworks, Cambridge Soundworks, in San Leandro --

19       MR. KUBO:  Warehouse in San Leandro.

20       THE COURT:  -- that's a pending case.

21       Do you understand that?

22       THE DEFENDANT:  Yes, I do, Your Honor.

23       THE COURT:  So Mr. Kubo has indicated a

24  proposed disposition of that case.  That's what we've

25  just recited.

26       THE DEFENDANT:  Yes.

27       THE COURT:  I've indicated that I'm willing to

28  go along with that offer to resolve that case.

```
1              THE DEFENDANT:  Can she explain it to me, Your
2    Honor?
3              THE COURT:  You want Ms. Burns?  She's already
4    explained it to you.  Do you want her to explain it
5    again?  Because it is important, because here's what's
6    going to happen.  This is what Mr. Kubo is offering
7    today.  Once it goes back down to Hayward to resolve it,
8    it may not be offered again.
9              THE DEFENDANT:  Okay.
10             THE COURT:  You want to take a moment?  I'll
11   give you five more minutes.  Five more minutes to talk
12   about this.
13             (Brief interruption.)
14             THE COURT:  We're back in court on the record
15   with counsel and Mr. Cabrellis.
16             Ms. Burns, have you had a chance to further
17   discuss the proposed disposition with your client?
18             MS. BURNS:  I have.
19             THE COURT:  What's his response?
20             MS. BURNS:  My client is not interested in
21   resolving that case.
22             THE COURT:  All right.  Okay.  That matter
23   will be set -- Ms. Burns, did you come up with a
24   proposed date for setting?  Would be Tuesday through
25   Friday, Department --
26             THE CLERK:  513.
27             THE COURT:  -- Department 513 at 9:00 a.m.?
28             THE CLERK:  9:15.
```

```
1              THE COURT:  9:15.  Let's do it soon.

2              MS. BURNS:  March the 10th, Your Honor.

3              THE COURT:  Mr. Kubo, any objection?  That's a

4   month away.  I'd like it within the next week or two.

5              MS. BURNS:  I'm sorry, Your Honor.

6   February 24th, please.

7              THE COURT:  Mr. Kubo, any objection?

8              MR. KUBO:  That's fine.

9              THE COURT:  February 24th, Department 513, in

10  Hayward, 9:15 for setting.

11             What do you have as his bail on this?

12             THE BAILIFF:  $100,000, Your Honor.

13             THE COURT:  Bail should remain at $100,000.

14             As to the docket 144018B, I've received, read,

15  and considered a Probation Officer's Report and

16  Recommendation that is nine pages in length.

17             Does counsel have any comments, corrections,

18  objections to anything contained in that report?

19             MR. KUBO:  No, Your Honor.

20             THE COURT:  Ms. Burns?

21             MS. BURNS:  No, Your Honor.

22             THE COURT:  Okay.  Ms. Burns, do you waive

23  arraignment for judgment and sentencing?

24             MS. BURNS:  Yes.

25             THE COURT:  Any legal cause why judgment

26  should not now be pronounced?

27             MS. BURNS:  No.

28             THE COURT:  The presentence report is admitted
```

1    into evidence.  There's also attached to that, looks

2    like, a six-page sentencing letter from Mr. Kubo.

3             MR. KUBO:  I believe it's seven pages.

4             THE COURT:  "Seven"?  Seven, yes.  That will

5    be admitted into evidence.

6             Mr. Kubo, did you want to add anything to your

7    sentencing letter?

8             MR. KUBO:  Actually, Your Honor, I do have a

9    witness here, Mr. David Divjak, who was the victim in

10   that he'd like to make a few comments to the Court.

11            THE COURT:  All right.  Just per the

12   documentation, I'll allow him to speak to the Court.

13            There is also a two-page letter from

14   Mr. Cabrellis that I've read and considered.  That will

15   be admitted into evidence for sentencing purposes.

16            There is a Probation Department Information

17   Form that was completed by Ms. French.  That will be

18   admitted into evidence.

19            There's also another form completed by Frances

20   Cabrellis, the mother of the Defendant.  That will be

21   admitted into evidence.  I've read and considered that.

22            There's -- looks like it's Laverne,

23   L-a-v-e-r-n-e, Padilla, also completed information on

24   that same form.

25            Cynthia Atkinson also completed information on

26   the Probation Officer's Form.  Looks like there's an

27   additional -- those are two pages; one sheet, two-sided.

28            There's a one-sided sheet presented and

```
 1   completed by -- and I cannot tell who this is.  It's a
 2   different individual than any of the other individuals.
 3   Julie -- Ms. Burns, can you help me?  It looks like
 4   somebody starting with a J-u-l something.  I can't read
 5   the signature.  I don't see any other information.
 6              MS. BURNS:  Trying to get to that same page,
 7   Your Honor.
 8              THE COURT:  It's the back of the packet.  They
 9   didn't complete --
10              MS. BURNS:  The last name?
11              THE COURT:  I can't tell on the last name, but
12   I will consider this.  Obviously, a friend or family of
13   the Defendant; friend or family member of the Defendant.
14              MS. BURNS:  I can't read it, either, Your
15   Honor.
16              THE COURT:  Ms. French also sent
17   individually -- this is Nancy French -- a two-page
18   letter, typewritten letter.
19              The other one I referred to, those other
20   forms, were hand-completed, and Ms. Frances,
21   F-r-a-n-c-e-s, Cabrellis also sent a one-page typed
22   letter with attachments from MCI.
23              MS. BURNS:  My client tells me the name is
24   Hubbard, the last name.
25              THE COURT:  All right.  What's the spelling on
26   that?
27              MS. BURNS:  H-u-b-b-a-r-d, I believe.
28              THE COURT:  H-u-b-b-a-r-d?  Okay.
```

1          And the attachments on the typed letters are

2    five pages in length.  Pardon me.  Seven pages in

3    length.  I've read and considered all of those documents

4    as well.

5          Go ahead, Mr. Kubo.

6          MR. KUBO:  Your Honor, the People would ask

7    the Court hear from Mr. David Divjak.

8          THE COURT:  Step forward, please, sir.

9          Morning, Mr. Divjak.

10         MR. DIVJAK:  Morning, Your Honor.  I'm going

11   to sit down, if you don't mind.

12         THE COURT:  Quite all right.

13         MR. DIVJAK:  First, we meet again.  Thank you

14   again for giving me a chance to speak this morning.

15         The point I would like to make about the

16   sentencing is this gentleman right here was the leader

17   of the crime that happened in my store (indicating).

18   This gentleman did not touch the gun, I'm willing to

19   admit, but controlled the weapon to the point that the

20   thing that bothers me the most, and the nightmare that

21   is recurring, is when he told the guy holding the gun

22   (indicating) to pull the hammer back, when it was

23   pointed at Ryan's head and said quote unquote, "We'll

24   blow your fucking head off," he's the one who told him

25   to pull the hammer back on the gun.  He controlled the

26   gun by doing that.  Had that gun gone off, there's no

27   way I would have gotten out of there, let alone Ryan,

28   because of his actions.

1        This is also the guy I am sure, Your Honor,

2   who ordered my dog killed.  He controlled everything

3   that happened in that store, and I'm convinced he

4   controlled everything that happened after.

5        The reason I referred to him as

6   Mr. Friendly --

7        THE COURT:  Let me interrupt so you

8   understand.  I'm sure Mr. Kubo told you it wasn't a

9   charged -- it wasn't evidence in court, and it's

10  frankly -- just so you know, I normally don't interrupt.

11  Just so you know -- you're intelligent; been through

12  this -- I'm not going to consider, unfortunately, the

13  death of your dog as part of the sentencing.

14       MR. DIVJAK:  I understand, I understand.

15       The reason I referred to him as Mr. Friendly

16  was not because he was friendly to us in any manner.  In

17  a very businesslike way, it was obvious he was trying to

18  keep us calm.  I'm convinced that the reason he didn't

19  order us killed is because there's wasn't an opportunity

20  to kill us (indicating).  Had the gun gone off, it might

21  have attracted enough attention that they wouldn't have

22  gotten away, not that they did.

23       But I'm thoroughly convinced, Your Honor, that

24  given the opportunity, that guy right there (indicating)

25  would have ordered us dead, would have ordered us

26  killed.  He threatened our lives continuously through

27  this crime.

28       This morning before you took the bench and

DIANNE J. DORN
CSR #7048

1  without counsel present, I stood right outside that

2  door, and he turned around and tried to communicate to

3  me.  He wasn't communicating to his family, because they

4  both turned around and looked at me as well.  He had to

5  be led out of here by your Bailiff.  I assume that's

6  your Bailiff led him out of here.  That guy is

7  dangerous.  He's a danger to Ryan.  I'm scared to death

8  of him.

9         The system works.  As I said last time, this

10  gentleman was given the chance to plead not guilty, and

11  he did.  He was tried and had sufficient counsel.  He

12  was found guilty, and he still sits here and claims he

13  didn't do this.  I'm thoroughly convinced given the

14  chance, he will cause harm to me and Mr. Antonelli.

15  After speaking to him last night, it appears he's chosen

16  not to come after telling me he was scared to death to

17  have to sit in a room with this guy again.

18         All I'm asking for today, Your Honor, is my

19  chance for the system to work, and to impose the maximum

20  sentence that you are allowed to, and allow me to start

21  trying to get over this stuff and get on with my life.

22         Thanks.

23         THE COURT:  Thank, Ms. Divjak.

24         Mr. Kubo, anything else?

25         MR. KUBO:  Nothing further, Your Honor.

26         THE COURT:  And you want to just state for the

27  record your recommendation?

28         MR. KUBO:  Yes, Your Honor.  My recommendation

1  is for the maximum term in this case, and I believe the

2  maximum term, as I have looked at it, is fourteen years,

3  four months' State Prison.  That would be staying the

4  12022.1 Bail Clause and the resolution of the Hayward

5  case.  And that would be asking for all the terms to be

6  consecutive, with the primary term being the 211 Second

7  Degree in Count 1.

8          THE COURT:  Ms. Burns, anything you'd like to

9  say to the Court?

10         MS. BURNS:  Your Honor, on behalf of my

11 client, I know that he would -- if he were to speak

12 directly to the Court, he would continue to maintain his

13 innocence.  And he has asked me to file a notice of

14 appeal.  It has been done.

15         THE COURT:  It can't be until I impose

16 sentence, but that's okay.  That's the intention, I take

17 it, for that meaning.

18         MS. BURNS:  He does.  He feels that he's not

19 been had given a fair chance to present his side of

20 things, and I've asked his family whether they would

21 like to make a statement.  My understanding is they

22 submitted something in writing.

23         THE COURT:  I have two documents from

24 Ms. French and Mr. Cabrellis's mother.

25         Thank you, Ms. Burns.

26         The Rules of Court govern the determinate

27 sentencing range that this Court must and certainly

28 agrees to abide by.

1         Rules of Court 413 subsection (a), Defendant

2  does appear to be eligible for probation.

3         Pursuant to Rule 414, Criteria Affecting

4  Probation:

5         (a)(1)  The crime entailed the robbery of a

6  stereo store in which two employee victims were bound,

7  held at gunpoint for some two hours, while Defendant

8  directed the responsibles in the looting of the store

9  and its safe, during the course of which the two

10  employee victims were repeatedly intimidated by

11  references of the responsibles having their

12  identification and being prepared to harm them and their

13  family members;

14         (a)(3)  The inherent vulnerability of the

15  victims being bound and held at gunpoint, also

16  intimidated, with the prospect of harm to themselves or

17  family members;

18         (a)(5)  The crime entailed a loss of no less

19  than $50,000;

20         (a)(6)  The Defendant was a knowing, active

21  responsible;

22         (a)(8)  The accomplishment of the crime would

23  demonstrate degree of criminal sophistication if not

24  professionalism on the part of the responsibles;

25         (b)(1)  The Defendant's moderately lengthy

26  criminal history relative to property crime;

27         (b)(2)  The Defendant's prior performance on

28  probation and parole was less than satisfactory;

1              (b)(3)   The Defendant's indicated an uncertain

2    willingness to comply with the likely terms of

3    probation;

4              (b)(4)   His theoretical ability to comply with

5    the reasonable terms of probation are present, however,

6    given his high school level of education, stable

7    residence, limited but dependable disability income

8    benefits, parental responsibilities, and disclaimers of

9    drug abuse;

10             (b)(5)   The likely deleterious effect of

11   imprisonment upon this Defendant and upon his dependent;

12             (b)(6)   The improbability of adverse

13   collateral consequences on Defendant's life resulting

14   from future felony convictions;

15             (b)(7)   Absence of expressed remorse for the

16   offense;

17             (b)(8)   It is likely that if not imprisoned,

18   the Defendant will be a danger to others.

19             As a result of (b)(2), (b)(3), and (b)(8),

20   that is, prior performance on probation, parole less

21   than satisfactory, his danger, the indicated danger,

22   that he will be to others, an unwillingness to comply

23   with the likely terms of probation are quite

24   significant, particularly in light of his record.

25             As indicated, he had his first misdemeanor in

26   1985 in Davis in October.  By November of that year, he

27   had been convicted of his first two felony convictions

28   for possession of stolen property.  He received six

1    months in County Jail.  His three years of probation on
2    probation violations extended for five years.

3         Subsequent to that, he was convicted of two
4    misdemeanor convictions in Fairfield in 1988, 1989.  The
5    second misdemeanor conviction, he failed miserably on
6    probation.  By November of that year, he was sentenced
7    to six months in County Jail for 853.7 of the Penal
8    Code, failures to appear.

9         By 1990 in Vacaville, he had picked up his
10   next level of felony conviction:  496, possession of
11   stolen property; sentenced to one year in County Jail on
12   a probation violation on that case.

13        1991, he was once again convicted of a felony.
14   This is -- it was burglary pursuant to 460.2, possession
15   of stolen property; 180 days in County Jail.

16        1993 in Napa, he was convicted of 466 of the
17   Penal Code, possession of burglary tools; given 90 days
18   in County Jail.

19        1995, he was once again convicted of a felony
20   496, possession of stolen property.  He suffered -- he
21   was sentenced to 16 months in State Prison, was paroled,
22   and returned on parole with parole violations three
23   times.

24        As a result of his prior conduct,
25   unsatisfactory performance on probation and parole, this
26   Defendant -- and the Court finds this Defendant is not
27   amenable to the terms and conditions of probation, and
28   probation is denied.

1        As far as the sentencing range and the

2   sentencing on the various Eight Counts that he was

3   convicted of, there are low or mitigated midterms and

4   upper or aggravated terms.  The Court's sentence is

5   governed by Rule 421 and 423 in these areas in addition

6   to the Rule 414.

7        Pursuant to Rule 421 (a)(1), the crime

8   involved a threat of bodily harm thereby disclosing a

9   high degree of cruelty, viciousness, and callousness on

10  the part of the responsibles;

11       (a)(2)  The Defendant was armed with a firearm

12  in the commission of the crimes;

13       (a)(3)  The victims were particularly

14  vulnerable;

15       (a)(4)  The Defendant occupied a position of

16  leadership and dominance with respect to the other

17  responsibles in the commission of the crime;

18       (a)(8)  The manner in which the crime was

19  carried out indicates planning and sophistication and

20  professionalism;

21       (a)(9)  The crime involved the actual taking

22  of great monetary value;

23       (b)(1)  The Defendant had engaged in violent

24  conduct which indicates a serious danger to society;

25       (b)(2)  The Defendant's prior convictions as

26  an adult are numerous;

27       (b)(3)  The Defendant has served prior prison

28  terms or a prior prison term;

1  been conducted and maintained without the necessity of
2  binding and moving these victims into the back room
3  without threatening their lives, without taking their
4  identification and threatening their family members, and
5  without robbing them individually;
6          These are other and could have been done,
7  also, without cutting the telephone lines and
8  threatening the and dissuading -- attempting to dissuade
9  the victims by threats of violence.  So to that extent,
10  they were independent of each other;
11          (b)(2)   The crimes involve separate acts of
12  violence and threats of violence;
13          (a)(3)   The crimes were committed at a single
14  location over a one-and-a-half- to two-hour time frame;
15          (b)(1)   The crimes involved the threat of
16  great bodily harm thereby disclosing a high degree of
17  cruelty, viciousness, or callousness on the part of the
18  responsibles;
19          (b)(2)   The victims were particularly
20  vulnerable;
21          (b)(3)   The Defendant occupied a position of
22  leadership or dominance with respect to participants in
23  the crime;
24          (b)(5)   The crime involved the actual taking
25  of great monetary value;
26          (b)(6)   The Defendant has engaged in violent
27  conduct -- contact which indicates a serious danger to
28  society;

1           (b)(7)   The Defendant's prior convictions are

2   numerous;

3           (b)(8)   The Defendant's prior performance on

4   probation and parole were unsatisfactory.

5           The Court is relying primarily in imposing a

6   consecutive term with the Arming to the principal upper

7   term and consecutive term on all of the remaining

8   Counts:

9           The fact that per (b)(2), the crime involved

10  separate acts of violence or threats of violence;

11          (b)(1)   The crime involved threats of great

12  bodily harm thereby disclosing a high degree of cruelty,

13  viciousness, and callousness on the part of the

14  responsibles;

15          (b)(2)   The victims were particularly

16  vulnerable;

17          (b)(3)   The Defendant occupied a position of

18  leadership or dominance with respect to the participants

19  in the crime.

20          Given the great monetary value of the crime

21  was enhanced, the Court is not using that in imposing

22  consecutive sentences.

23          As a result, the one-year State Prison on the

24  Arming Clause of Count 2 will be consecutive to the

25  upper term:  Five plus one is six years;

26          12022 subsection (1).1 subsection (c), it's a

27  mandatory consecutive two years in State Prison.

28  However, pursuant to subsection (d), this will be stayed

1  per the outcome of docket H-32759C. As a result, in a

2  conviction, the two years' State Prison will be imposed;

3  however, at this point it is stayed;

4         Count 3 also involves a Robbery, Second

5  Degree, with a range of two, three, five. One-third of

6  the midterm is one year. The Arming, one-third the

7  Arming, is four months. Those will be imposed

8  consecutive or additional: Total of one year, four

9  months; total of seven years, four months. The

10  one-third of the two years on the 12022.1 subsection (c)

11  is eight months. That will be stayed as it will be on

12  the other remaining Counts pending the outcome of the

13  Hayward case;

14         Count 3 is a subordinate term. Remaining are

15  also the subordinate term: Robbery, Second Degree,

16  sixteen, two, three years in State Prison. One-third of

17  the midterms is eight months. That shall be imposed

18  consecutive. The Arming Clause, four months. That

19  shall also be imposed consecutive. Four months on the

20  OR/Bail -- pardon me -- the great monetary value

21  pursuant to 12022.6 subsection (a) subsection (1), that

22  is a one year, shall be imposed, four months

23  consecutive, an additional total of one year, four

24  months, for a total of eight years, four months. Eight

25  months on the OR/Bail Clause shall be stayed;

26         Count 4, also subordinate term, the False

27  Imprisonment, range of sixteen, two, and three. That

28  shall carry -- I shall impose eight months consecutive,

1    the Arming Clause on that, four months consecutive,

2    additional total of one year, four months, for a tot

3    of nine years, eight months. The OR/Bail Clause, eight

4    months, shall be stayed;

5           Count 5, an additional subordinate term of the

6    False Imprisonment, also the same range as Count 4,

7    which I'll impose the one-third the midterm as well as

8    one-third the Arming, be a total of eight months and

9    four months consecutive, now running the total to ten

10   years, eight months. Attempted 136.1 (b)(2), Dissuading

11   a Witness, carries a range of sixteen months, two, and

12   three years in State Prison. One-third the midterm is

13   eight months. The Arming, one-third is four months.

14   Those shall be imposed -- that shall be imposed

15   consecutive, additional total of one year, for a total

16   of eleven years, eight months;

17          Count 7, also Attempted Dissuading of a

18   Witness, the Court shall impose eight months and four

19   months, one-third the midterm, as well as one-third of

20   the Arming Clause, additional year, twelve years, eight

21   months;

22          Count 8, cutting a utility line, carries a

23   range of sixteen months, two, and three years. The

24   Court shall impose one-third the midterm for a total of

25   eight months consecutive. That should run the total to

26   thirteen years, four months;

27          The prior conviction of -- the prior

28   convictions alleged against Mr. Cabrellis, found to be

1    true.  The first prior conviction, State Prison prior,

2    pursuant to 667.5, it's a one-year additional sentence.

3    The Court shall impose this consecutive.

4         The total the Court imposes sentencing on

5    Mr. Cabrellis is fourteen years, four months.

6         This Defendant is given credit for how many

7    days?

8         THE BAILIFF:  494 actual, 75 days' Sage, for a

9    total 569 days' credit for time served.

10        THE COURT:  The Defendant is ordered to pay a

11   Restitution Fine in the amount of $1,000 on Count 1 and

12   $200 on the remaining Counts each.  Any restitution is

13   reserved.

14        Pursuant to Section 1202. -- pardon me.  That

15   fine is imposed pursuant to 1202.4 subsection (b).  A

16   second restitution in the same amount is imposed

17   pursuant to 1202.45 of the Penal Code, which will be

18   imposed upon a grant of parole.

19        The Court has considered the seriousness and

20   gravity of the offense, the circumstances of its

21   commission -- of their commission such as economic

22   losses in setting the amount.  The Director of

23   Corrections may collect this restitution, these fines,

24   from the Defendant's earnings in prison.

25        Mr. Cabrellis, pursuant to Penal Code 3000.1,

26   after the expiration of the minimum term and with any

27   conduct credits, you may be placed on parole.  The

28   period of parole, if parole is granted, shall not exceed

```
 1  60 months.  If you violate any provision of your parole
 2  grant, your parole may be revoked, and you could be
 3  incarcerated for a period not to exceed 12 months in
 4  each instance of revocation, unless the reviewing panel
 5  or board determines that the circumstances and gravity
 6  of the parole violation are such that considerations of
 7  the public safety requires a more lengthy period of
 8  incarceration or unless there's a new prison commitment
 9  following conviction.
10          Do you understand what I've just told you
11  about your parole rights, sir?  I'm sorry.  I didn't
12  hear you, Mr. Cabrellis.
13              THE DEFENDANT:  Yes.
14              THE COURT:  It is my duty at this time to
15  advise you of your appeal rights.  You have the absolute
16  right to appeal from the judgment of this Court in
17  imposing sentence on you today.  That means if you wish
18  to appeal, you must file a written notice of your
19  intention to appeal within 60 days from today.  That
20  notice must be in writing and signed by you or your
21  attorney or both of you.  It must specify what you are
22  appealing from, whether it is the whole judgment or just
23  part of the judgment.
24          If you do appeal, you'll have the right to a
25  complete transcript of the trial court proceeding.  That
26  is provided by law without any cost to you.  If you
27  appeal and do not have the financial ability to retain
28  the services of any attorney to represent you on appeal,
```

1    the appellate authorities will appoint counsel to

2    represent you.

3            In that regard, it is your obligation to keep

4    the appellate authorities advised at all times of your

5    current residing address so they can be in touch with

6    you to advise you of your appointed counsel.

7            Do you understand what I've just told you with

8    regard to your appeal rights?

9            THE DEFENDANT:  Yes, I do, Your Honor.

10           THE COURT:  Do you understand that unless you

11   file your written notice of your intention to appeal in

12   this court, not at the Court of Appeals, within 60 days

13   from today's date, that you lose that right forever?

14           THE DEFENDANT:  Yes, I do, Your Honor.

15           THE COURT:  Do you have any questions you wish

16   to ask me about your appeal rights?

17           THE DEFENDANT:  Is this the -- what you doing

18   right now?  Okay.

19           THE COURT:  You can file your notice of appeal

20   now.

21           Do you understand your appeal rights, sir?  Do

22   you understand your appeal rights?

23           THE DEFENDANT:  Yes, I do, Your Honor.

24           THE COURT:  The Defendant is remanded for

25   transportation to the Department of Corrections.

26           Any bail is exonerated.

27           The Court Reporter is ordered to prepare a

28   transcript of the entire sentencing proceeding and file

```
 1  a certified copy with the Clerk of this Court.
 2            MR. KUBO:  There is one other thing:  A
 3  restitution amount for the two victims.
 4            THE COURT:  I think that was actually in the
 5  report.
 6            MR. KUBO:  The restitution out of Cambridge
 7  Soundworks should be reserved.
 8            THE COURT:  I did reserve it.
 9            MR. KUBO:  I believe the restitution amount to
10  Mr. Divjak is --
11            MR. DIVJAK:  372.
12            MR. KUBO:  $372.
13            MR. DIVJAK:  Excuse me.
14            THE CLERK:  392 and 50 to Antonelli.
15            MR. KUBO:  50 to Antonelli.
16            THE COURT:  I think the PO had that.
17            MR. KUBO:  I believe my letter stated 480 or 5
18  or 50, but I believe Mr. Divjak is correct.
19            THE COURT:  I think, actually, it was not in
20  the probation -- it's here.  It has 480.  I will --
21  Rhoda, what did you indicate?
22            THE CLERK:  392.
23            THE COURT:  To Mr. Divjak will also be ordered
24  as restitution; $50 to Mr. Antonelli.  Those amounts can
25  be taken from the Defendant's earnings in State Prison
26  by the Director of the Department of Corrections.
27            THE CLERK:  296 PC.
28            MR. KUBO:  There should be a 296 order.
```

```
 1              THE COURT:  The Defendant is also ordered to
 2  provide blood and saliva samples per 296 of the Penal
 3  Code.  For some reason, I think the PO made a mistake on
 4  that.  The PO didn't advise that.
 5              Okay.  Anything else, Mr. Kubo?
 6              MR. KUBO:  No, Your Honor.
 7              THE COURT:  Ms. Burns, anything else?  Yes?
 8              THE CLERK:  On -- I think on Count 6 and 7,
 9  the eight months for the Bail/OR stayed, also?
10              THE COURT:  Yes.  I'm sorry.  On the -- yes.
11  On the 6 and 7, it's one-third the midterm on the
12  OR/Bail Clauses.  They shall be stayed pursuant to
13  subsection (b) of that Section.
14              THE CLERK:  Thank you.
15              THE COURT:  Thank you, Counsel.
16              MS. BURNS:  One -- I had two questions.  One,
17  I wanted to move to withdraw.  At what stage --
18              THE COURT:  The Hayward case.
19              MS. BURNS:  On this case.
20              THE COURT:  Yes.  I don't think there's
21  anything further for you to do on this case, unless you
22  wish to.  But I don't know if withdrawing is actually
23  necessary.  You can indicate to the Court your wish to
24  withdraw.
25              MS. BURNS:  My client wanted to make a
26  statement.  I don't know whether the Court --
27              THE COURT:  I'm finished with the sentencing
28  now.  It's done.  You have to worry about this pending
```

```
 1  case, Mr. Cabrellis.  All right.

 2              MS. BURNS:  Thank you very much.

 3              THE COURT:  Thank you.

 4              (Whereupon, at 10:56 a.m., the proceedings

 5  were adjourned.)

 6                        ---o0o---

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

```
 1   STATE OF CALIFORNIA    )
                            )    ss.
 2   COUNTY OF ALAMEDA      )

 3

 4

 5

 6          I, DIANNE J. DORN, do hereby certify:

 7

 8          That I am a Certified Shorthand Reporter of

 9   the State of California, and duly appointed shorthand

10   reporter in the Superior Court for the County of

11   Alameda, State of California;

12          That on December 11, 12, 18, 22, 2003, and

13   February 11, 2004, I fully and correctly reported the

14   within-entitled matter, Day 22, 23, 27, 29, and 31, of

15   the Jury Trial of the Defendants, RICKY RENEE SANDERS

16   and CEARIACO CABRELLIS, before the Honorable Leo Dorado,

17   Judge;

18          That the foregoing pages 3034 through 3710,

19   other Reporters' pages omitted, are a full, true, and

20   correct transcription of my shorthand notes taken at the

21   said time and place.

22          IN WITNESS WHEREOF, I have hereunto subscribed

23   my name this 22d day of August, 2004.

24

25                          DIANNE J. DORN

26                          _____

27                          DIANNE J. DORN, CSR #7048

28
```

DIANNE J. DORN
CSR #7048

# PROOF OF SERVICE BY MAIL

I _CEARIACO CABRELLIS_____, AM A RESIDENT OF FOLSOM STATE PRISON IN THE
COUNTY OF SACRAMENTO, STATE OF CALIFORNIA. I AM OVER THE AGE OF 18 YEARS,
AND I AM /AM NOT A PARTY TO THIS ACTION.
    MY PRISON NUMBER IS: _V63705_____
    MY PRISON ADDRESS IS; **P.O. BOX 950, Folsom, Ca. 95763**


    ON _3-11_____, 2008, I SERVED A COPY OF THE FOLLOWING
DOCUMENT:

PETITION FOR WRIT OF HABEAS CORPUS


    ON THE FOLLOWING PARTIES BY PLACING THE DOCUMENTS IN A SEALED
ENVELOPE WITH POSTAGE FULLY PAID, IN THE UNITED STATES MAIL, IN A DEPOSIT
BOX SO PROVIDED AT FOLSOM STATE PRISON (MAILBOX RULE), FOLSOM,
CALIFORNIA, ADDRESSED AS FOLLOWS:

```
US DISTRICT COURT                    OFFICE OF ATTORNEY GENERAL
EASTERN DISTRICT OF CALIFORNIA       1300 "I" STREET,STE.125
501 "I" STREET                       SACRAMENTO,CA 95814
SACRAMENTO,CA 95814
```


    THERE IS DELIVERY SERVICE BY THE UNITED STATES MAIL AT THE PLACE SO
ADDRESSED, AND/OR THERE IS REGULAR COMMUNICATION BY MAIL BETWEEN THE
PLACE OF MAILING AND THE PLACE SO ADDRESSED.

    I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE
AND CORRECT.


    EXECUTED ___3-11_____, 2008, AT FOLSOM, CALIFORNIA..


                                                  &lt;signature here &gt;